**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **K.M., a minor, by and through her parent and guardian ad litem, BRENDA MARKHAM,** | **1:15-cv-001835 LJO JLT** |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER AFFIRMING ADMINISTRATIVE DECISION** |
| **v.** | |
| **TEHACHAPI UNIFIED SCHOOL DISTRICT and KATHLEEN SICILIANI,** | |
| **Defendants.** | |

## I. <u>INTRODUCTION</u>

This case concerns an administrative due process hearing under the Individuals with Disabilities Education Act ("IDEA").  20 U.S.C. § 1400 *et seq.*  Student K.M. ("Student"), by and through her guardian ad litem, Brenda Markham ("Ms. Markham"), brings this appeal of an education due process hearing and decision pursuant to 20 U.S.C. § 1415(i)(2)(A).  Student contends that the decision of the Administrative Law Judge ("ALJ") of the California Office of Administrative Hearings ("OAH") erred in several ways, denying her a free appropriate public education ("FAPE").  Doc. 1.  Student seeks relief including an award of 230 hours of one-to-one compensatory education or compensation for 230 hours of private tutoring, the assignment of a one-to-one behavior aide to Student for the full school day, and an award of attorney's fees and costs.  Doc. 40 at 30-31.  Defendants Tehachapi Unified School District ("District" or "the District"), and Director of Student Services for Tehachapi Unified School District Kathleen Siciliani ("Ms. Siciliani") (collectively "Defendants") contend that the ALJ's decision was correct and should be upheld.

## II. <u>PROCEDURAL HISTORY</u>

Student filed a request for a due process hearing with the OAH on March 20, 2015. Doc. 1 at ¶ 25. The District filed a due process complaint notice on May 22, 2015, seeking a determination that the District was not responsible for individual independent educational evaluations of Student in the areas of occupational therapy, speech and language, and adaptive physical education. *Id.* at ¶ 26; Administrative Record ("AR") at 112-14. The ALJ held a consolidated hearing over 10 days between July 30 and August 27, 2015, before. *Id.* at ¶ 28. The ALJ, following the prehearing conference, identified the following issues as Student's issues for the hearing:

A. Did District deny Student a free and appropriate public education at the March 22, 2013, March 17, 2014, and December 18, 2014 (as continued to January 22, 2015, and February 3, 2015) individualized education program [("IEP")] team meetings by failing to offer appropriate goals, specifically:

(1) March 22, 2013, IEP: Goal numbers 1 (Communication), 3 (Reading), 4 (Writing), and 6 (Social/Emotional), and lack of goals regarding assistive technology/communication and ability to stay on task;

(2) March 17, 2014, IEP: Goals numbers 1 (Math), 2 (Reading), 3 (Social/Emotional), 4 (Communication), 5 (Communication), 7 (Social/Emotional), and lack of goals regarding assistive technology/communication and ability to stay on task; and

(3) December 18, 2014, IEP: Goals numbers 1 (Math), 2 (Communication), 3 (Communication), 4 (Math), 5 (Reading), 6 (Social/Emotional), 7 (Communication), 8 (Social/Emotional)?

B. Did District deny Student a FAPE at the March 22, 2013, September 4, 2013, March 17, 2014, May 30, 2014, and December 18, 2014 (as continued to January 22, 2015, and February 3, 2015) IEP team meetings by failing to offer appropriate services in the areas of:

(1) Behavior support; and/or

(2) Assistive technology?

C. Did District deny Student a FAPE by significantly impeding Parents' opportunity to participate in the decision making process by failing to provide to Parents appropriate documentation and communication regarding the use of restraints on Student in November 2014, and Student's injuries in connection with the following incidents: (i) the choking of Student in August 2013; (ii) Student's sunburn in 2014; (iii) Student's fat lip in September 2014; and (iv) Student's ingestion of narcotics in fall 2014?

D.  Did District deny Student a FAPE at the December 18, 2014 (as continued to January 22, 2015, and February 3, 2015) IEP team meetings by:

(1) Significantly impeding Parents' opportunity to participate in the decision making process by predetermining placement; and

2) Failing to consider placement in the least restrictive environment?

AR at 317-18, 1102-03.  The ALJ addressed the following as District's issues for the hearing:

A.  Did District conduct an appropriate occupational therapy assessment of Student such that District is not required to provide Student with an independent educational assessment at public expense?

B.  Did District conduct an appropriate speech and language assessment of Student such that District is not required to provide Student with an independent educational assessment at public expense?

C. Did District conduct an appropriate adapted physical education assessment of Student such that District is not required to provide Student with an independent educational assessment at public expense?

AR at 317, 1103.  On October 2, 2015, the ALJ issued her decision, finding that Student's objections to the IEP goals and the lack of assistive technology support were without merit and that the District offered sufficient behavior support, with the exception of the March 17, 2014, IEP.  AR at 1104.  The ALJ found that District failed to provide Student with sufficient behavior support and so deprived her of a FAPE from the time of the March 2014 IEP until November 2014 when the IEP was amended.  *Id.* The ALJ also found that the District's offer of a placement at another school and offer of transportation were procedurally and substantively appropriate and did not deprive Student of an education in the least restrictive environment ("LRE").  AR at 1104.

On December 4, 2015, Student filed a complaint which included this appeal.  Doc. 1.  On March 7, 2016, Student filed an amended complaint.  Doc. 14.[1]  On August 5, 2016, Magistrate Judge Thurston

---

[1] Student's initial complaint also named Heather Richter, Director of Programs for Tehachapi Unified School District, as a defendant.  Doc. 1 at 1.  While the captions of some later documents filed with the Court, including District and Ms.

1   granted in part Student's motion to augment the administrative record, permitting Student to submit as

2   evidence recordings of five IEP meetings which occurred after the administrative decision was issued.

3   Doc. 39 at 4.  On August 29, 2016, Student filed a second amended complaint.  Doc. 41.  The Court has

4   jurisdiction to hear this appeal under 20 U.S.C. §§ 1415(i)(2) and (3), and Student has exhausted her

5   administrative remedies.  Student asserts that Defendants violated the IDEA and California Educational

6   Code § 56000 *et seq.*  Student argues that Defendants breached their duty to provide a FAPE by failing

7   to offer Student an appropriate education given her particular needs.  Doc. 14 at ¶¶ 31-48.  Student also

8   seeks recovery of attorneys' fees under 20 U.S.C. § 1415(i)(3)(B).  *Id.* at ¶ 71.[2]

9                              ### III. FACTUAL BACKGROUND

10          Student is a minor child who is eligible for special education and related services because she has

11  autism.  AR at 1104.  Student resides within the District's boundaries and attended Cummings Valley

12  Elementary School from 2012 until Student's parents removed her from that school in March 2015.  *Id.*

13  Student's issues include difficulties paying attention, elopement[3] from places and tasks, hitting, biting,

14  kicking, pushing, throwing objects, screaming, and whining.  *Id.*

15  **2012-2013: Student's Kindergarten Year and IEP**

16          In the 2012 to 2013 school year, Student was enrolled in a kindergarten mild/moderate special

17  day classroom with 12 to 14 other children who had special education eligibilities.  AR at 403, 1105.

18  The class met four days per week for 200 minutes per day.  AR at 404.  Student was mostly nonverbal in

19  this class but was able to communicate her wants and needs by sign language and some verbal

20  _____

21  Siciliani's opposition briefs to Student's trial brief, Doc. 42; Doc. 43, list Ms. Richter as a defendant, the parties stipulated to

    the removal of Ms. Richter as a defendant.  Doc. 14 at 1; Doc. 15.

22  [2] In her complaint and amended complaint, Student alleged violations of 42 U.S.C. § 1983, 42 U.S.C. § 12101 *et seq.*, 29

23  U.S.C. § 794, and 42 U.S.C. § 1985.  Doc. 14 at ¶¶ 49-70.  This Decision and Order addresses only Student's administrative

24  appeal.

25  [3] "Elopement" is escaping the classroom.  AR at 1610.

                                          4

communication with her teacher.  AR at 1105.

On March 22, 2013, Student's annual IEP meeting took place with Student's IEP team present.[4] AR at 409.  The IEP team determined that Student's greatest need was in staying focused, but that her cognition was at a level where she could be expected to achieve more than a child with a disability.  AR at 410.  Student had shown progress in reading, writing, and math, as well as responding to "if-then" prompts and obeying classroom rules and procedures.  *Id*.  She had also made progress on her speech goals and in communicating with staff.  *Id*.

The IEP team developed a number of annual goals for Student in areas which included following instructions, verbalizing, writing, reading, math, and social/emotional behavior.  AR at 412-418.  The IEP provided for a one-to-one aide to assist Student in staying on task and transitioning between activities.  AR at 420.  Student's behavior problems were accommodated through a visual schedule, a warning before activity transitions, preferential seating, additional classroom movement, privileges, rewards and praise for specific behaviors, verbal encouragement, on-task reminders, visual cues, and using preferred activities for reinforcement.  AR at 419.  Student would participate in lunch and recess with her peers in general education, but would remain in the mild/moderate special day class for her other activities.  AR at 420, 422-23.  The IEP provided Student with 40 minutes per week of speech and language services, special education summer school, and transportation.  AR at 423.  The team discussed using an iPad to assist staff with sign language, and at Ms. Markham's request Student was allowed to bring an iPad to school.  *Id*.  Student's parents agreed to the IEP.  AR at 424.

**2013-2014: Student's First Grade Year and IEP**

On August 23, 2013, shortly after Student's first grade school year commenced, a classroom

---

[4] An IEP team is composed of the parents of the student, a representative of the local educational agency, the student's teacher or teachers, and, when appropriate, the student.  20 U.S.C. § 1414(d)(1)(B).  The team may also include other individuals with knowledge or special expertise regarding the student.  *Id*.

1  incident occurred wherein another student placed his hands around Student's neck to choke her.  AR at

2  425-32.  The other student had reacted to Student reaching for the student's personal toy, which the

3  student's mother was holding.  *Id*.  Student was not injured in the incident.  *Id*.

4          On September 4, 2013, District held an IEP team meeting at the request of Student's parents to

5  discuss the August 23 incident.  AR at 435.  In addition the Student's parents and teachers, two school

6  psychologists, Student's speech and language pathologist, a District occupational therapist who had

7  witnessed the incident, and two representatives of Student's home provider of applied behavior analysis

8  services were present at the meeting.  AR at 438.  Since the incident, Student had expressed fear and

9  anxiety and resisted going to school.  *Id*.  Student's parents were also concerned that Student's class was

10 being taught by a series of substitutes due to Student's teacher leaving her employment early in the

11 school year.  *Id*.[5]  Student's parents requested daily communication from Student's teacher, and Ms.

12 Markham again raised the question of Student bringing an iPad to school for communication.  *Id*.

13 Student's parents did not express any further concerns in response to prompting from the District

14 representatives, but Ms. Markham stated at the hearing that she did not think the District would be

15 responsive to any additional concerns.  AR at 3632-34.

16         Student's aide and Ms. Markham both noticed that Student's behavior deteriorated after the

17 August 2013 choking incident.  AR at 3190, 3200.  Student began to display behaviors including

18 anxiety, fear, reluctance to attend school, and refusal to enter the classroom if the student who had

19 choked her was inside.  AR at 1625, 3188-89.  The other student was transferred to a different

20 classroom, which apparently made Student more comfortable, but her behavior did not improve and she

21 engaged in aggressive behaviors as well as elopement.  AR at 1610, 1618-19, 1622.  During the same

22 timeframe, Student was mainstreamed into an arts and crafts class, which she enjoyed, and would stay in

23 as long as she could attend to the task at hand.  AR at 1647.

24 _____

25 [5] District hired Richard Stanley as a permanent teacher for Student's first grade class in October 2013.  AR at 1603.

In progress reports on October 17, 2013, and January 10, 2014, District noted that student was progressing in her goals of following oral directions, verbalizing needs for assistance, reading, transitioning between activities, and complying with the teacher's directions.  AR a 498-501.  She had met her writing and math goals.  *Id*.  Ms. Markham communicated with Student's classroom teacher Richard Stanley, and other District personnel regarding behavior strategies, and a January 31, 2014, e-mail to Ms. Markham from Mr. Stanley indicated that Ms. Markham's visits and ideas were helpful.  *Id*.

Student's first quarter report card for first grade indicated that she received 1's, denoting insufficient progress toward the standard, in all areas of reading and in the single area of math in which she was tested.  AR at 503.  Her teacher's notes indicated that Student enjoyed school, but assessments were difficult for Student and she often became frustrated.  *Id*.  Student's third quarter report card showed that she received 1's in all areas in which she was tested except for a 2, indicating that she was progressing toward the standard, in computation-addition.  *Id*.  Her teacher noted that the report was a bit misleading as Student knew her alphabet and sounds, and could perform addition problems up to 10.  Student's report card does not list any grades were listed for Student's second quarter.  *Id*.

District held an IEP meeting for Student with all members present on March 17, 2014.  AR at 809.  Student's need was identified as speech, while her strengths were that she was quick to pay attention and was smart.  AR at 800.  The team revised Student's writing goal, continued and expanded upon her goal of improving transitions, and developed new annual goals.  AR at 809.  The new annual goals included a math subtraction goal based on first grade standards, a reading goal based on kindergarten standards but using first grade level words, and a social/emotional goal that addressed transitioning to a non-preferred activity without tantrums or more than one prompting.  AR at 801-04.  Two new goals addressed communication, one involving following two and three step oral instructions and the other recognizing pictures when named or given a choice by vocalizing words and multi-word phrases.  *Id*.  Two new social/emotional goals involved Student initiating an appropriate verbal or nonverbal response to a verbal prompt and using appropriate greetings with adults and peers when given

1  direct verbal prompts.  *Id*.

2  The March 17, 2014, IEP provided accommodations including warnings before transitions, a

3  visual schedule and cues, preferential seating, a one-to-one aide, simple, repetitive directions, extra

4  classroom movement as necessary, positive reinforcement and on-task reminders, the use of

5  manipulatives, and increased verbal response time.  AR at 805.  The IEP noted that Student's behavior

6  impeded her learning and that of others and included behavior goals, but did not include a behavior

7  support plan.  AR at 806.  The IEP did not provide for any assistive technology.  *Id*.  It did provide for

8  Student to attend a general education first grade class with her one-to-one aide for 30 minutes weekly in

9  order to provide exposure and socialization, as well as special day class placement, 40 minutes of speech

10  services per week, special education summer school, and door-to-door transportation.  AR at 808-10.

11  Student's parents consented to the IEP.  AR at 811.

12  On May 30, 2014, District called an IEP meeting at the request of Ms. Markham, who wanted to

13  discuss Student's status and how to prepare her over the summer for the next school year.  AR at 812.

14  Student's general education teacher did not attend the meeting, but Ms. Markham, Ms. Siciliani, the

15  school principal, Student's special education teacher, and Michelle Flores, an employee of Multilevel

16  Services, attended the meeting.  *Id*.  The IEP team recommended ways to prepare Student for the next

17  school year and in improving her academic performance.  *Id*.  The special education teacher reported on

18  Student's current achievements in various academic and goal areas.  *Id*.  Ms. Markham said that the

19  meeting had answered or addressed her questions and concerns.  *Id*.

20  **2014-2015: Student's Second Grade Year and IEP**

21  In August of 2014, Student began second grade in a mild/moderate special day class containing

22  10 children and taught by Nancy Piercy.  AR at 1111-12.  Student initially had a succession of

23  temporary one-to-one aides, and as a result Ms. Markham requested that the District contract with

24  Multilevel Services to provide a one-to-one aide until a permanent aide could be hired, and to provide up

25  to six months of training for the new aide.  AR at 515-16.  Ms. Markham noted that the prior year had

1  been traumatic for Student, and said that Student's teacher the prior year had not spent one-on-one time

2  with Student and that the classroom lacked structure. *Id.* She also said that Student copied the

3  detrimental behaviors of other children in her prior classroom. *Id.* Ms. Markham described the progress

4  Student had made in her kindergarten class and compared it to the deterioration she observed during

5  Student's first grade year. *Id.*

6      On August 29, 2014, Student's class had a water play day in which the students were allowed to

7  play in small plastic pools outside of the classroom while wearing swimwear. AR at 530-35. The

8  students were outdoors for approximately one hour and 20 minutes, and were also allowed to eat lunch

9  outside in addition to taking their usual lunch and afternoon recesses. *Id.* When Student returned home,

10 her mother noticed that Student was badly sunburned on her back, shoulders, and scalp, which she

11 reported to the school. *Id.* On September 10, 2014, Student fell on a sidewalk at school and sustained a

12 bruised lip. Student's teachers did not explain how Student fell in their incident reports. AR at 525-29.

13 Ms. Markham noted that Student had a scuff on her elbow as well. *Id.* After the fall, Student's parents

14 took her to a doctor for an examination, and, after noticing a line on her front teeth, took Student to a

15 dental clinic which specialized in treating children with disabilities. AR at 3639-40, 3643.

16     On September 16, 2014, Student's parents requested the District move up Student's scheduled

17 triennial assessment and complete a functional behavior assessment ("FBA"). AR at 767. Ms.

18 Markham gave District signed consent to triennial assessments in the areas of academics, self-

19 help/social and emotional status, motor abilities, language and speech, general ability, and adapted

20 physical education on October 6, 2014. AR at 877.

21     On October 7, 2014, a serious incident occurred during lunch where Student took and opened an

22 unattended blister pack containing two Diastat[6] applicators. AR at 537-47. Student manipulated the

23 ─────────────

24 [6] Diastat is a diazepam rectal gel which is used to control seizures. *Diastat AcuDial*, http://www.diastat.com/ (last accessed

25 March 24, 2017).

9

applicator causing the Diastat to release onto her hands and the table. *Id.* An aide washed Student's

hands and the table, and school officials called 911. *Id.* Student's parents were called to the school and,

after consulting with an EMT, took Student to a hospital. *Id.* The incident reports prepared by aides and

teachers who were present had some discrepancies, but suggested that there was confusion as to who

was responsible for safeguarding the narcotic medication and poor communication between aides when

one aide left the cafeteria to walk another student back to the classroom and another aide apparently left

to eat her lunch. *Id.* As a result of the incident, Student's parents removed her from school and served

District with a 10-day notice that they intended to place Student into private school and seek

reimbursement from District. AR at 556.

On October 9, 2014, District held an IEP meeting to address the October 7 incident, Student's

sunburn, and her bruised lip, as well as an incident where Student escaped from her classroom

unbeknownst to staff. AR at 824. The meeting was attended by Troy Tickle, the County Special

Education Local Plane Area Coordinator, Ms. Siciliani, Student's parents, and counsel for Student's

parents and for District. AR at 822. District agreed to contract with Multilevel Services to provide

Student with a one-to-one aide for eight weeks, and agreed that Student need not return to school until

the aide was available. *Id.* The team also agreed that Student should be mainstreamed for up to 20

minutes per day. *Id.* District reported that Student had made progress on all of her goals except for her

reading goal, where Student had regressed. *Id.* The team agreed to keep Student's goals in place since

new information would be available within eight weeks from triennial assessments and a FBA. *Id.* The

goals and IEP were to be addressed after the team reviewed the FBA and assessments. *Id.*

On October 23, 2014, the IEP team re-convened the October 9 meeting to discuss the role and

services of Multilevel Services. AR at 823. Multilevel Services was retained to conduct a FBA set to

begin on October 24 and direct observations of Student at school would begin on October 27. *Id.* The

IEP team agreed that Student would continue to have a one-to-one aide while Multilevel Services

completed its assessment. *Id.* No new or changed IEP goals were agreed to at the meeting. A

November 4, 2014, addendum gave Multilevel Services more time to complete the FBA and provided that Multilevel Services would train student's aide in applied behavior analysis.  AR at 825.  Multilevel Services would provide Student with one-one-one aide time for 230 minutes per day on Monday and Wednesday, with the goal of increasing the time to a full school day of 317 minutes on each weekday. AR at 826.

**Student's Evaluations**

Jennifer Faulk, a licensed speech-language pathologist, performed a speech and language evaluation of Student on November 18, 2014.  AR at 892, 1039.   Ms. Faulk interviewed Student's school speech and language pathologist as well as Student's teacher, aides, and mother.  AR at 896.  She also reviewed Student's educational records.  AR at 892-4.  Ms. Faulk assessed Student using the Preschool Language Scale-5, the Peabody Picture Vocabulary Test-4, the Speech Mechanism Examination, the Expressive Language Sample, informal speech tasks, and informal pragmatic checklists.  AR at 897.  She also used alternative assessment instruments, including language sampling, informal assessment, observation of communication interactions, and interpretation of standardized test results in non-standard ways.  *Id*.

Based on her evaluations of Student, Ms. Faulk concluded that Student functioned with severe deficits in all areas of communication secondary to her autism diagnosis.  AR at 905.  Student's scores in receptive language were equivalent to a normally developing child of three years seven months to four year ten months and her scores in expressive language were equivalent to those of a normally developing child from two years three months to two years ten months.  *Id*.  Student demonstrated significant interfering behaviors, including reaching/grabbing, ignoring/refusing, over-focusing on preferred tasks and objects, impulsivity, frequent need for movement, and short attention span, which impaired her ability to participate in directed tasks.  *Id*.  She responded well to offers of tangible rewards and short frequent breaks from directed activities in exchange for participation.  *Id*.

Student demonstrated understanding of early language concepts up to the four year six month old

level and could understand labels for familiar items and actions, routine directions, and yes or no questions about her personal needs. *Id.* Student showed some understanding of verbal negotiating concepts. *Id.* She had difficulty with verbal tasks requiring longer listening sets or verbal reasoning. She could use labels for a variety of nouns and actions and combine words in short routine phrases to express her needs and wants. *Id.* She was not able to use her verbal skills to take turns in conversation of answer questions about story book pictures of recent events, but was showing some emerging skills in replacing nonverbal skills with verbal skills. *Id.* Student's speech intelligibility level was significantly below the expected level for her age, and her speech was often difficult to understand without context clues. *Id.*

Ms. Faulk recommended that Student be placed in a special day class with frequent opportunities to develop functional communication skills. AR at 907. She also recommended a highly structured classroom with a low student to teacher ration to ensure that Student had access to frequent prompting and assistance in attending to and participating in classroom activities. *Id.* Ms. Faulk opined that a speech-language pathologist should be available to consult in developing and implementing Student's classroom communication program. *Id.* She also recommended direct speech and language therapy, with specific goals including following simple directions, identifying pictures containing critical elements, identifying pictures corresponding to a specific spoken word sounds, and using intelligible sentences to talk about actions in pictures. *Id.* Ms. Faulk felt that Student's prognosis was good, in light of the severity of Student's deficit and her progress thus far. *Id.* The prognosis was contingent upon regular classroom communication training, direct speech and language therapy, and willingness on the parents' part to help carryover newly learned skills to the home environment. *Id.*

Barry Lille, a school psychologist for the County Schools Superintendent, issued a report of his psycho-educational evaluation of Student on December 10, 2014. AR at 879. Mr. Lille observed Student in class on two occasions, including recess. AR at 880. He assessed Student through the Developmental Test of Visual-Motor Integration and the Differential Ability Scales-Second Edition, and

Ms. Markham provided information for the Developmental Profile-III.  AR at 881-82.  Mr. Lille opined that Student was eligible for special education as a student with autism, and that her cognitive skills were in the borderline rage with strengths in vocabulary skills.  AR at 885.  He opined that Student's then-current placement was a good fit for her cognitive and academic skills, but not as good a fit for her behaviors.  AR at 886.  He did not recommend a placement for Student, and suggested that her areas of greatest need were in improving her compliance, decreasing her inappropriate behaviors, and lengthening the periods during which she could work without a break or reinforcement.  *Id*.

Melissa Tomberlin, a board certified behavior analyst from Multilevel Services, performed a FBA of Student in November 2014.  AR at 916.  Ms. Tomberlin assessed Student through a file review, collection of behavior data through a "Questions About Behavior Function" test, interviews with teachers and staff, direct observation, and a Functional Behavior Assessment Interview with Student.  *Id*. Ms. Tomberlin observed that Student's disruptive activities had the primary goal of getting something she wanted and a secondary function of escaping a disfavored activity.  AR at 921.  She recommended 14 goals and objectives for Student and a number of strategies for behavior intervention, treatment, and data collection.  AR at 921-23.  Ms. Tomberlin also recommended that Student be provided with 24.5 to 27.5 hours per week of one-on-one instructional aide support for 12 weeks to train staff in implementing her recommendations and eight to ten hours per month of treatment supervision.   AR at 927.  Finally, she recommended that Student's mainstreaming be put on hold pending further review in order to focus on decreasing Student's challenging classroom behaviors.  *Id*.[7]

**Student's 2014-2015 Triennial IEP**

On December 18, 2014, District convened Student's triennial IEP team meeting.  AR at 827. The team members presented Student's psychoeducational, speech and language, occupational therapy,

---

[7] District also assessed Student in the areas of occupational therapy, AR at 909-15, and adaptive physical education.  AR at 887-91.  Neither assessment is pertinent to the issues raised in this appeal.

1   and adapted physical assessments, and discussed Student's present levels of performance.  AR at 846.

2   Student's parents requested the use of an iPad and additional time for gross motor and physical

3   education activities, which the team agreed to explore.  *Id.*  Following the presentation of Multilevel

4   Services FBA, the team agreed that Multilevel Services and District's school psychologist should

5   collaborate to develop a behavior support plan.  *Id.*  The team agreed to reconvene on January 22, 2015.

6   *Id.*

7           The IEP meeting reconvened on January 22, 2015.  AR at 847.  The IEP team reviewed and

8   revised the behavior support plan and agreed on new behavioral goals and an intervention plan.  *Id.*

9   Student's behavior support plan identified aggression followed by Student falling to the ground or

10   throwing items near her as a behavior that interfered with learning, and suggested teaching replacement

11   behaviors and coping strategies and using reinforcement for desirable behaviors.  AR at 840-45.  The

12   plan also included goals focused on Student using words to obtain objects and participate in activities.

13   *Id.*

14           The IEP team also reviewed Student's previous goals and revised the unmet goals.  AR at 847.

15   Twelve new goals were included in the IEP.  AR at 830-35.  Goal 1 was a math goal based on a

16   kindergarten standard which required Student to interpret products of whole numbers.  *Id.*  Goal 2 was a

17   communication goal involving following two and three step directions and was repeated from Student's

18   March 17, 2014, IEP.  *Id.*  Goal 3 was a communication goal which required Student to recognize

19   pictures when named.  *Id.*  Goal 4 was another math goal requiring Student to learn addition facts to 10.

20   Goal 5 was a reading goal involving Student decoding high frequency words at the first and second

21   grade levels.  *Id.*  Goal 6 was a communication goal carried over from the March 17, 2014, IEP, and

22   involved Student responding appropriately to verbal prompts.  *Id.*  Goal 7 was a communication goal

23   involving Student following four to six word instructions including pronouns.  *Id.*  Goal 8 required

24   Student to use a visual schedule to transition to non-preferred activities and was a social/emotional goal.

25   *Id.*  Goal 9 was a communication goal which involved Student correctly identifying the correct picture

from a set of three in response to sentence prompts. *Id.* Goal 10, another social/emotional goal, required Student to initiate appropriate greetings with teachers and peers. *Id.* Goal 11 was a social/emotional goal requiring Student to increase her engaged academic time, and Goal 12 was a communication goal involving Student speaking clearly when identifying a picture. *Id.*

The accommodations identified by the IEP team for Student included a visual schedule, warning before transitions, seating away from distractions and noise, a one-to-one aide, an opportunity for movement in the morning, directions given one at a time, simple and repetitive directions, extra classroom movement, on-task reminders using visual cues, preferred activities for reinforcement, increased verbal response time, the use of "manipulatives", and visual cues. AR at 836. Student would be mainstreamed for no more than 10 percent of the time including passing periods, recess, lunch, and school activities. AR at 837. The IEP team considered the continuum of placement options available in the District, which included general education classrooms with special education monitoring, consultation, collaboration, accommodations, or modification; general education classrooms with special education services provided in the classroom; general education classroom with special education services provided in small groups outside the classroom; special education classrooms with part-time general education classroom integration for academics; special education classrooms with part time general education classroom integration for non-academic or extracurricular activities; and full-time special education classes in a non-public school. AR at 847.

Ms. Siciliani said that District operated mild/moderate and moderate/severe special day classes, and only the moderate/severe special day class was led by a teacher with special training in teaching children with autism. *Id.* She thought that District had attempted the strategies preferred by Student's parents, including providing the requested aide from Multilevel Services and the services which were available in a non-categorical[8] classroom, but Student required more support than District could provide.

---

[8] Non-categorical means that the students in the classroom have different disability eligibilities and the curriculum for each

1  *Id.* Mr. Thompson, the principal of special education programs for County Schools Superintendent, said

2  that the County schools operated a kindergarten through third grade categorical classroom for eight to

3  ten children with autism at Stockdale Elementary in Bakersfield.  AR at 848.  The categorical

4  classroom's teacher had a master's degree in special education and a moderate to severe credential for

5  working with students with autism.  *Id.*  She also had been trained by an applied behavior analysis

6  nonpublic agency.  *Id.*  The categorical classroom used a visual schedule and a token economy system,

7  applied behavior analysis and discrete trial systems were part of the classroom program, and a speech

8  therapist worked directly in the classroom.  *Id.*  The classroom was equipped with a smart board and was

9  technology enriched, and implemented reverse mainstreaming, in which typically developing students

10  attended the categorical classroom at times.  *Id.*  District offered to provide door-to-door transportation

11  to and from Bakersfield, California.  *Id.*  Mr. Thompson thought that the County would be able to

12  implement Student's behavior support plan, and recommended that Student attend the categorical

13  classroom based on the information presented at the December 14, 2014, and January 22, 2015, IEP

14  meetings.  *Id.*

15     Student's parents expressed concerns regarding Student's travel time to Stockdale Elementary in

16  Bakersfield and her safety during the commute.  *Id.*  Student's father recounted an incident where he

17  followed a District school van speeding and driving recklessly.  *Id.*  Both parents were concerned about

18  the impact of travel time of Student's free time.  *Id.*  They also raised concerns about conflicts with

19  Student's and home behavior plan, which was provided by the Regional Center and consisted of two

20  hours per day Monday through Friday and four hours on two Saturdays per month of applied behavioral

21  analysis.  *Id.*  Mr. Thompson recommended that Student's parents visit the Stockdale Elementary

22  categorical classroom, and that Student try out the placement for 30 days, after which an IEP meeting

23  could be convened to discuss the placement and any adjustments.   *Id.*  The IEP team continued the

24

25  student may be different.  AR at 848.

16

1   meeting, keeping the one-to-one aide from Multilevel Services in place.  *Id.*  Student's parents scheduled

2   a visit to Stockdale Elementary to inspect the program but cancelled due to illness and did not

3   reschedule the visit before the next IEP team meeting.  *Id.*

4          The IEP meeting reconvened on February 3, 2015.  AR at 848.  District reiterated that the

5   mild/moderate special day class it offered at Student's home school was not taught by an instructor

6   certified to teach children with autism, and that the moderate/severe classroom, which had a teacher

7   certified to teach children with autism, was non-categorical.  AR at 619, 848.  Mr. Thompson added that

8   there were currently eight students and four aides in the Stockdale categorical classroom, and that a

9   program specialist with training in teaching students with autism oversaw the program.  AR at 848.

10  Roberta Miller, the District transportation supervisor, said that District could take a two hour bus ride

11  with other students, or a van without other students which would take approximately 80 minutes each

12  way.  AR at 849.  She added that there were contingency plans in place for weather events or accidents,

13  but no District student had ever needed to spend the night in Bakersfield due to either eventuality.  *Id.*

14  In response to a concern raised by Student's father, District offered to train the bus driver to interact

15  with special education students.  *Id.*

16         When Ms. Markham asked the Multilevel Services representative for her opinion of the

17  Stockdale Elementary placement, the Multilevel Services representative said that she needed to gather

18  more data.  *Id.*  Ms. Markham said that Student's kindergarten teacher had thought that the

19  mild/moderate classroom was a good placement, that Student had been able to transition, and that her

20  work was showing progress.  *Id.*  She also noted that the behavior support plan had not been

21  implemented in a District classroom.  *Id.*  Ms. Markham also asked why a categorical classroom would

22  be better, and Mr. Thompson said that, since the students had similar needs, strategies could be

23  implemented for the entire classroom.  *Id.*  Student's father had no opinion, but asked that Student's one-

24  to-one speech and language services be increased.  *Id.*  Student's attorney opined that District could

25  provide the same program as the County.  *Id.*

Student's parents agreed to the implementation of the behavioral goals, services, and behavior support plan in a February 13, 2015, e-mail to Ms. Siciliani.  AR at 854-62.  They did not agree to the offer of a FAPE at Stockdale, did not agree with the placement, and did not agree that District had offered a FAPE for Student.  *Id.*  The e-mail also included nine pages of comments and attachments to the IEP.  *Id.*  On February 18, 2015, Ms. Siciliani sent an e-mail to Student's parents stating that she had corrected various defects in the previous copy of the IEP, had attached the nine pages of comments and attachments, and requested clarification as to the goals with which Student's parents agreed.  AR at 770-71.  District gave notice to Student's parents that it would be terminating the services of Multilevel Services on February 20, 2015, as the services were not included in the FAPE District offered, and Student's last day of school was February 23, 2015.  AR at 929, 1138.

**Student's 2015 Psychoeducational Evaluation by Dr. Gilbertson**

On February 19, 2015, Student's parents requested an independent psychoeducational evaluation.  AR at 772.  Student and her mother visited the Stockdale categorical classroom along with Student's psychologist and Mr. Thompson for an observation.  AR at 684.  The observation began in the middle of a recess held indoors due to inclement conditions outside, which was followed by a bathroom break and large group instruction.  *Id.*  Approximately ten minutes of large group instruction were included in the observation.  *Id.*

District agreed to the independent psychoeducational assessment on March 20, 2015.  Dr. David Gilbertson issued his report of the assessment on April 27, 2015.  AR at 666.  Dr. Gilbertson's assessment included interviews with Student's parents, a review of Student's medical records, behavioral observation, and a number of rating scales and tests.  AR at 668.  Student's parents completed the Achenbach Behavior Rating Scale and the Conners 3 Behavior Rating Scale, and Ms. Munoz and Ms. Kielpinski, two of Student's behavior therapists, also completed the Achenbach Behavior Rating Scale.  *Id.*  Dr. Gilbertson requested that Ms. Piercy complete the Achenbach Behavior Rating Scale and the Conners 3 Behavior Rating Scale, but District did not agree to permit Ms. Piercy to

1   do so because Student had not recently been enrolled in a District program.  AR at 689.

2         The observation portion of the assessment was conducted in Student's home and at a local

3   community center, and Student was accompanied by her mother and her home behavioral therapist.  AR

4   at 683.  Dr. Gilbertson opined that Student demonstrated ongoing, significant delays in academic

5   functioning, speech/language functioning, pragmatic communication, fine and gross motor skills, social

6   awareness, social interactions, adaptive behavior, and attentional skills.  AR at 693.  He also opined that

7   Student's educational delays were exacerbated by processing deficits in visual-motor coordination,

8   visual perception, motor coordination, auditory/oral comprehension, auditory memory, and executive

9   function.  *Id.*  Dr. Gilbertson thought that District had difficulty assessing and providing a FAPE to

10  Student.  *Id.*  He stated that his testing indicated that Student's general nonverbal cognitive abilities were

11  in the normal range but that her behavior was characteristic of children classified as high functioning

12  autistic.  AR at 694.  He opined that Student also had significant behavioral symptoms associated with

13  Attention-Deficit/Hyperactivity Disorder, Hyperactive-Impulsive Type, and that District had not

14  identified or addressed Student's educational disabilities.  AR at 694.  His diagnosis of Student was

15  autism spectrum disorder, without intellectual impairment, with language impairment, requiring very

16  substantial support and attentive-deficit/hyperactivity disorder, predominantly hyperactive/impulsive

17  type.  AR at 696.

18        Dr. Gilbertson recommended three essential changes to Student's educational planning, services,

19  and learning expectations.  AR at 694.  First, he recommended that personnel working with Student

20  understand that she is a child with high functioning autism, autism related learning disabilities, and

21  significant behavioral deficits but normal intelligence.  *Id.*  Dr. Gilbertson opined that District had

22  misdiagnosed Student as autistic-like with mild mental retardation and developmental delays and

23  continued to provide services to Student based on that diagnosis.  AR at 694-95.  Dr. Gilbertson thought

24  that the misdiagnosis lowered educational expectations and prevented Student from receiving essential

25  education services for a child with autism.  AR at 695.

Second, Dr. Gilbertson recommended that Student not be placed in "one size fits all" type programs and instead have an educational program tailored to her specific strengths and weaknesses. AR at 695. He opined that Student's placement in generic special day classrooms with children who exhibited a variety of disabilities and instructors not specifically trained in teaching children with autism has led to increased behavioral incidents and safety concerns. *Id.*

Third, Dr. Gilbertson recommended that the programming and services provided to Student be specific to her disability and focused on evidence based practices with a track record of success. AR at 696. Any program for Student should be developed and implemented by staff with experience and expertise in teaching children with autism. *Id.* Dr. Gilbertson thought that the generic special day classroom approach to Student's education had been ineffective, and that intensive individual and evidence-based interventions were necessary to allow Student to experience positive educational growth and progress. *Id.*

Dr. Gilbertson also recommended 18 specific actions based on his assessment: (1) Student should be identified as a student with exceptional learning needs and educational disabilities due to autism, and her secondary disability of Other Health Impaired due to attention-deficit/hyperactive disorder, hyperactive-impulsive type; (2) District should develop an intensive individual behavioral program tailored to Student's specific needs, including intensive one-on-one adult led interventions up to 25 hours per week and pivotal response training for a period of one year; (3) Student should have additional opportunities for mainstreaming; (4) Student should be allowed one hour per day for child-led activities; (5) Student should be in a small, self-contained homogeneous class with no more than 6 to 8 eight students with cognitive functioning within the low average to higher range and with behavioral characteristics associated with high functioning autism, led by a teacher and two aides trained to work with children with autism, and implementing an intensive language based program emphasizing language skills, social interactions, academics, motor skills, and behavior and implementing 20 specific behavioral and development strategies; (6) Student should be provided a behaviorally trained one-on-

one aide and a detailed, specific positive behavior support plan should be developed by a trained and certified behavior specialist; (7) Student should have an extended school day and additional training in individual and small group settings; (8-13) Student should have independent educational assessments in occupational therapy, physical therapy, adapted physical education, assistive technology, augmentative communication, and speech-language and pragmatic language; (14) Student should receive one hour per week of music therapy; (15) Student's written reports and educational records identifying her as mentally retarded should be redacted; (16) Student should receive intensive individual and small group speech-language services; (17) Student should be referred to an audiologist for a central auditory processing assessment and; (18) Student should be referred for a medical psychiatric evaluation.  AR at 697-99.

**Student's 2015 FBA by Dr. Hayden**

Dr. Jeffery Hayden conducted an independent FBA and issued his report on August 4, 2015.  AR at 645.  Dr. Hayden reviewed Student's medical records, interviewed Student's parents and in-home behavior therapist, and performed direct observations on June 18, July 1, July 9, and July 24, 2015.  AR at 645-47.  Dr. Hayden criticized District's FBA and behavior support plans, stating that they had methodological problems including a lack of specificity in setting goals.  AR at 652-660.  He opined that Student's educational placements in special day classrooms have been inappropriate, and denied her an education in the least restrictive environment.  AR at 663.  He thought that Student's placements resulted in "excess disability," that is, negative outcomes which are not directly part of Student's disabling condition.  *Id.*  He cited as examples Student's failure to establish and maintain social connections and her low academic test scores despite Dr. Gilbertson's evaluation of Student as having average intelligence.  *Id.*

Dr. Hayden recommended that District identify qualified staff with appropriate training to support Student, or, if none were available, contract with an outside agency to provide proper support to Student.  AR at 663-64.  He recommended that Student receive one-on-one support, and that a positive

1  behavior intervention plan be developed for Student.  AR at 664.  At the administrative hearing, he

2  opined that the Stockdale placement, based on Dr. Gilbertson's description, was not appropriate for

3  Student.  AR at 2705.   He generally agreed with Dr. Gilbertson's recommendations.  AR at 2649.

4      **Additional Evidence**

5      Student sought to introduce additional evidence consisting of audio recordings of IEP meetings

6  which took place on October 19, October 30, and December 7, 2015, and March 3 and 31, 2016.

7  Student's Supplemental Evidence Exhibits ("Exhibits") C-G.  Student returned to her home school under

8  the "stay-put" doctrine after the ALJ issued her decision.  Doc. 39 at 4.  The IEP meetings took place

9  after Student's return to her home school.  *Id*.  Student was directed to lodge electronic copies of the

10  recordings with the Clerk of Court by August 19, 2016, by Judge Thurston.  *Id*. at 6.  It is not apparent

11  whether such copies were lodged, but Student included transcribed excerpts from Exhibits F and G with

12  her trial brief.  Docs. 40-2, 40-3.  The Court has reviewed the excerpts offered.  Student does not refer to

13  other portions of the recordings in her trial brief or reply briefs.

14      In the excerpt from Student's March 3, 2016, IEP meeting, an IEP team member stated that

15  Student was able to do five math problems by herself with a pencil and paper while working

16  independently.  Doc. 40-2 at 1.  She said that it had taken eight weeks for Student to arrive at that point,

17  and that Student was able to self-direct herself to complete half of a worksheet before selecting a

18  preferred activity.  *Id*.  Student was able to work for seven to ten minutes on academic tasks at least once

19  out of four trials per day in the days prior to the meeting.  *Id*. at 2.  The IEP member described Student's

20  growth as "tremendous," though she also noted that Student's behaviors had not entirely diminished.  *Id*.

21      In the excerpt from Student's March 31, 2016, IEP meeting, the IEP team discussed Student's

22  performance since she returned to her home school.  Doc. 40-3.  IEP team members said that Student

23  had improved and was talking more since returning to school, and was able to remain at a table with a

24  group for 20 minutes to a half hour so long as she had something to do with her hands.  *Id*. at 1-2.  A

25  team member said that Student escaped the classroom once after she had returned to school.  *Id*. at 2.

# IV. THE PARTIES' CONTENTIONS

Student assigns four errors to the ALJ's decision.  First, Student contends that the ALJ erred in determining that District failed to provide Student with proper behavior supports only from March to November of 2014.  Doc. 40 at 9, 16.  Student argues that the ALJ also should have found that the District unreasonably failed to conduct a behavior assessment at the time of the September 2013 IEP meeting.  *Id.* at 16.  District responds that the ALJ correctly applied the standard which was in place as of the September 2013 IEP meeting based on the evidence provided at the hearing, and that her finding that District's actions were reasonable were consistent with the evidence.  Doc. 43 at 20.

Second, Student argues that the ALJ erred in finding that District's offer of a Stockdale placement constituted the LRE.  Doc. 40 at 9.  The ALJ erred, Student asserts, by not analyzing the Stockdale placement as a whole, failing to properly place the burden on District to justify the Stockdale placement and instead imposing on Student the burden of proving the Stockdale placement inappropriate, and assuming that Student could not be appropriately educated at her home school.  *Id.* at 21-27.  District argues that the Stockdale placement was consistent with the recommendation of Dr. Gilbertson, provided opportunities for mainstreaming, and that the ALJ appropriately analyzed whether the length of Student's commute would deny her a FAPE.  Doc. 43 at 15-16.

Third, Student assigns error to the ALJ in her determination that the goals in Student's March 2013 and 2014 IEPs met Student's disability related needs.  Doc. 40 at 9, 17-20.  Student alleges that the IEPs failed to include goals which specifically addressed maintaining attention and staying on task, which Student characterized as her "greatest need."  *Id.* at 18.  The ALJ improperly concluded that goals addressing Student's ability to comply with directions and classroom accommodations sufficiently addressed Student's attention problems, Student contends.  *Id.* at 18-19.  District responds that the IEPs met the standard of being "reasonably calculated to provide educational benefit" to Student.  Doc. 43 at 21.  Student did not show that her "greatest need" was paying attention and staying on task, and evidence in the record supports the ALJ's conclusion that other goals addressed Student's attention

23

1    difficulties. *Id.* at 21-22.

2        Fourth, Student alleges that the ALJ should have ordered compensatory education to rectify the

3    denial of a FAPE from March 17, 2014.  Doc. 40 at 9.  The ALJ found that Student was denied a FAPE

4    from March to November of 2014 due to District's failure to perform a behavior assessment.  Student

5    contends that the ALJ erred by not ordering compensatory education in accordance with her request of

6    one-to-one reading, writing, and math instruction, and a full-time one-to-one behaviorally trained aide.

7    *Id.* at 28-29.  District argues that the ALJ correctly found that Student did not offer any specific evidence

8    showing a need for compensatory education, and that the ALJ's order of a transition plan and additional

9    behavior supports was a sufficient equitable remedy for the denial of Student's FAPE.  Doc. 43 at 28.

10       Ms. Siciliani's responsive brief is limited to the question of whether the Stockdale placement

11   constituted the LRE for Student.  She contends that the ALJ properly analyzed the evidence regarding

12   the Stockdale placement and that her conclusion was based on the evidence.  Doc. 42 at 2-11.  Ms.

13   Siciliani's arguments generally proceed along the same lines as those set forth by District.

14                        **V. <u>STANDARD OF DECISION</u>**

15       In an action appealing the administrative determination in an IDEA case, the reviewing court "(i)

16   shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the

17   request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such

18   relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  "Complete de novo review of

19   the administrative proceeding is inappropriate."  *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 817

20   (9th Cir. 2007).  The party challenging the administrative decision bears the burden of demonstrating

21   that the ALJ's decision should be reversed on appeal.  *Ms. S. ex rel G. v. Vashon Island Sch. Dist.* [*Ms.*

22   *S.*], 337 F.3d 1115, 1127 (9th Cir. 2003); *Clyde K. v. Pullayup Sch. Dist., No. 3*, 35 F.3d 1396, 1399 (9th

23   Cir. 1994).

24

25

# VI. ANALYSIS

## A.    IDEA Statutory Framework

The IDEA provides federal funds to help state and local agencies educate children with disabilities while conditioning the funds on compliance with specific goals and procedures.  20 U.S.C. § 1412; *Bd. of Educ. Of Hendrik Hudson Cent. Sch. Dist. v. Rowley* [*Rowley*], 458 U.S. 176, 179-80 (1982) (describing the origin and primary provisions of IDEA).  The IDEA is intended "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs."  20 U.S.C. § 1400(d)(1)(A).  A FAPE is defined as "special education and related services that . . . are provided in conformity with the [IEP] required under section 1414(d)" of the IDEA.  20 U.S.C. § 1401(9).  An IEP is "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d)" of the IDEA.  20 U.S.C. § 1401(14).  "Parents participate along with teachers and school district representatives in the process of determining what constitutes a 'free appropriate education' for each disabled child."  *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992).

A court's inquiry in IDEA cases is twofold, and requires determining first whether the local educational agency has complied with the IDEA's procedures and second whether the substantive IEP developed through those procedures is "reasonably calculated to enable the child to receive educational benefits."  *Rowley*, 458 U.S. at 206-07 (construing the Education for All Handicapped Children Act, IDEA's precursor); *see also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist.* [*Endrew F.*], No. 15-827, __S. Ct. __, 2017 WL 1066260 at *10 (Mar. 22, 2017) ("To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.").  The reviewing court evaluates the IEP for objective reasonableness in light of information available at the time it was drafted.  *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999).  An IEP is not evaluated on hindsight, but rather as a "snapshot" of the

1   circumstances at the time the IEP was crafted.  *Id.*  The court focuses primarily on the District's

2   proposed placement, and not on alternatives the parents may have preferred.  *Gregory K. v. Longview*

3   *Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987).

4   **B.    Deference**

5           District courts apply a modified *de novo* standard of review to the appropriateness of a special

6   education placement under the IDEA.  *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004,

7   1108-09 (9th Cir. 2009).  While "less deference than is conventional in the review of agency decisions"

8   is afforded to an IDEA administrative decisions, *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir.

9   1988), "courts must give due weight to judgments of education policy."  *Ojai Unified Sch. Dist. v.*

10  *Jackson* [*Ojai*], 4 F.3d 1467, 1472 (9th Cir. 1993) (quoting *Gregory K.*, 811 F.2d at 1311) (internal

11  quotation marks and brackets omitted).  "The court, in recognition of the expertise of the administrative

12  agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution

13  of each material issue."  *Gregory K.*, 811 F.2d at 1311 (quoting *Town of Burlington v. Dep't of Educ.*,

14  736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985)).  When applying the modified *de novo*

15  standard, the court assigns deference to the administrative decision when it is careful, thorough,

16  impartial, and sensitive to the complexities of the case.  *Cnty. of San Diego v. Cal. Special Educ.*

17  *Hearing Office* [*San Diego*], 93 F.3d 1458, 1466-67 (9th Cir. 1996); *Ojai*, 4 F.3d at 1476.  A court may

18  "treat a hearing officer's findings as thorough and careful when the officer participates in the

19  questioning of witnesses and writes a decision containing a complete factual background as well as a

20  discrete analysis supporting the ultimate conclusions."  *R.B. ex rel. F.B. v. Napa Valley Unified Sch.*

21  *Dist.* [*R.B.*], 496 F.3d 932, 942 (9th Cir. 2007).  "After consideration, the court is free to accept or reject

22  the findings in part or in whole."  *Gregory K.*, 811 F.3d at 1311.  Though a court has "discretion to reject

23  the administrative findings after carefully considering them, [a court is] not permitted simply to ignore

24  the administrative findings."  *San Diego*, 93 F.3d at 1466.  "The court reviews findings of fact for clear

25  error, even if those findings are based on the administrative record."  *R.B.*, 496 F.3d at 937.

1    Student argues that the ALJ's decision should not be accorded deference.  Doc. 40 at 11.  The

2    record before the Court shows that the ALJ presided over a hearing lasting a total of 10 days spread over

3    nearly a month.  The 77 page decision contains 210 paragraphs of thorough and well supported factual

4    findings, and complete, well-reasoned, and thoughtful conclusions.  AR at 1101-77.  The ALJ cites to

5    the appropriate legal standards, explains her conclusions, and supports her conclusions with relevant

6    facts.  Therefore, the Court affords considerable deference to the ALJ's findings and conclusions.

7    **1.    Student's September 2013 and March 2014 IEPs**

8    Student contends that the ALJ failed to apply consistently the same standard when reviewing her

9    IEPs.  Doc. 40 at 16.  She argues that, since the ALJ found that Student was denied a FAPE because

10   District did not perform a functional analysis assessment ("FAA") during the period from March to

11   November of 2014, The ALJ also should have found that Student was denied a FAPE beginning in

12   September of 2013 because no FAA was performed for that period either.  *Id.*  According to Student,

13   District was aware that Student was exhibiting the same behaviors in September 2013 as she was in

14   March 2014, and that those behaviors mandated the performance of a FAA.  *Id.* at 17.

15   District argues that the ALJ differentiated between the two periods based on evidence in the

16   record.  Doc. 43 at 19-20.  It asserts that Student's behaviors had not risen to the level at which a FAA

17   would be required under the IDEA in September 2013.  *Id.* at 20.  Additionally, District notes, Student

18   was still making progress toward her IEP goals at the time of the September 2013 IEP meeting.  *Id.*

19   The ALJ determined that District committed a procedural violation by not conducting a FAA of

20   Student at the time of the March 17, 2014, IEP meeting.  AR at 1158-59.  The procedural violation

21   impeded Student's access to a FAPE, the ALJ concluded, because Student did receive a FAA and

22   additional behavioral services after the October 9, 2014, IEP meeting, based on some of the same

23   behaviors she had displayed in March 2014.  *Id.*  The ALJ found that it was likely an FAA offered in

24   March 2014 would have produced results indicating that District should offer additional services.  *Id.*

25   The failure to provide an assessment, including a FAA, is a procedural violation.  *Park v.*

1    *Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2005).  Procedural safeguards in the

2    IDEA "ensure that a child's education is fair and appropriate and the parents have an opportunity to

3    participate in the IEP formulation process." *L.J. ex rel Hudson v. Pittsburg Unified Sch. Dist.*, 835 F.3d

4    1168, 1178 (9th Cir. 2016).  A procedural violation of IDEA constitutes a denial of a FAPE only if the

5    violation (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to

6    participate in the decision making process regarding the provision of a FAPE to the child; or (3) caused

7    a deprivation of educational benefits.  20 U.S.C. § 1415(f)(3)(E)(ii).  "Procedural flaws do not

8    automatically require a finding of a denial of a FAPE," but when the flaws result in "the loss of

9    educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP

10   formulation process" a FAPE has been denied.  *W.G. v. Bd. of Tr. Of Target Range Sch. Dist.*, 960 F.2d

11   1479, 1484 (9th Cir. 1992) (citations omitted).

12        As of the September 4, 2013, IEP, the relevant California regulations required that a FAA "shall

13   occur after the IEP team finds that instructional/behavioral approaches specified in the student's IEP

14   have been ineffective."  Cal. Code of Regs. Tit. 5 § 3052(b) (repealed Oct. 16, 2013 pursuant to Cal.

15   Educ. Code § 56523(a)).  A behavioral intervention plan must be based upon a FAA.  Cal. Code Regs.

16   tit. 5 § 3052(a)(3)(repealed Oct. 16, 2013 pursuant to Cal. Educ. Code § 56523(a)).   California

17   regulations defined a behavioral intervention plan as a "written document which is developed when the

18   individual exhibits a serious behavior problem that significantly interferes with the implementation of

19   the goals and objectives of the individual's IEP."  Cal. Code Regs. tit. 5 § 3001(g) (repealed May 5,

20   2014).  "Serious behavior problems" were "behaviors which [are] self-injurious, assaultive, or cause

21   serious property damage and other severe behavior problems that are pervasive and maladaptive for

22   which the instructional/behavioral approaches specified in the student's IEP are found to be ineffective."

23   Cal. Code Regs. tit. 5 § 3001(ab) (repealed May 5, 2014).

24        Therefore, for Student to prevail on this issue, she must have been improperly denied an

25   assessment and the denial must have impeded her right to a FAPE, significantly impeded her parents'

1  ability to participate in the decision making process regarding the provision of a FAPE, or deprived

2  Student of educational benefits.  The September 4, 2013, IEP meeting was an interim meeting, at which

3  there was no finding by the IEP team that the instructional/behavioral approaches specified in Student's

4  IEP were ineffective.  There is no evidence in the record of that Student displayed self-injurious or

5  assaultive behaviors, behaviors causing serious property damage, or other severe behavior problems at

6  the time of the September 4, 2013, IEP, though she did have some aggressive behaviors, as well as an

7  increase in fear and anxiety, following a classroom incident where another student strangled her.

8  Moreover, at the time, the instructional and behavioral approaches specified in Student's IEP had not

9  been tested in resolving the aggressive behaviors Student had displayed.  There was no meeting of the

10 IEP team between September 4, 2013, and March 17, 2014, at which the IEP team could have

11 determined that the instructional and behavioral approaches in Student's IEP had proved ineffective.

12 Student made progress on her goals during the period from September 2013 to March 2014, though her

13 maladaptive behaviors apparently worsened over this period.  AR at 1158 ¶ 29.  Taking into account

14 Student's progress toward her IEP goals and the less serious behaviors she exhibited at the time of the

15 September 4, 2013, IEP meeting, the ALJ concluded that California regulations did not mandate a FAA

16 of Student in September 2013.  *See A.G v. Paso Robles Joint Unified Sch. Dist.*, 561 Fed. App'x 642,

17 644 (9th Cir. 2014) (a student did not display a serious behavior problem necessitating a FAA despite

18 having attempted suicide because there was no evidence that the behavior was pervasive or that the

19 student's IEP could not remedy the situation, and where the student was making progress toward his

20 goals).  Student has not provided any evidence that her behaviors were more extensive than the ALJ

21 recorded in her decision.  Although, as Student notes, District was aware of Student's deteriorating

22 behaviors between the September 2013 and March 2014 IEP meetings, Doc. 40 at 17, District had no

23 duty to begin a FAA before the IEP team determined that the behavioral and instructional approaches in

24 Student's IEP had been ineffective.  Cal. Code Regs. tit. 5 § 3052(b) ("A [FAA] shall occur *after* the

25 IEP team finds that instructional/behavioral approaches specified in the student's IEP have been

1  ineffective.") (repealed Oct. 16, 2013 pursuant to Cal. Educ. Code § 56523(a)).  The Court therefore

2  finds that Student has failed to establish that the ALJ committed clear error in not finding that she should

3  have received a FAA in September 2013 and was not denied a FAPE from September 4, 2013, to March

4  17, 2014.

5  **2.  Student's IEP Goals**

6  Student argues that the ALJ erred in finding that her IEP goals were appropriate when no goal

7  specifically addressed "maintaining of attention and remaining on task," which Student contends was

8  her "greatest need."[9]  Doc. 40 at 17.  She argues that the ALJ improperly found that Student's needs in

9  maintaining attention were addressed by other goals, and that the IDEA requires that each of a student's

10  educational needs which results from a disability be addressed by IEP goals.  *Id.* at 18-20.  Student

11  asserts that maintaining attention and staying on task had been her greatest needs since her Kindergarten

12  IEP.  *Id.* at 18.

13  District argues that that standard of review for an IEP is "whether the IEP is reasonably

14  calculated to provide educational benefit to the student."  Doc. 43 at 21 (quoting *Rowley*, 458 U.S. at

15  206-07).  There is no "definitive" evidence that maintaining attention and staying on task was Student's

16  greatest need in her Kindergarten IEP, and the only IEP team members who identify maintaining

17  attention as Student's greatest need are her parents, District contends.  *Id.* at 21.  District notes evidence

18  in the record indicating that goals involving following two and three step instructions would address

19  Student's ability to pay attention to verbal information.  *Id.* at 22.  District also observes that the ALJ

20  found that Student's issues with maintaining attention were addressed in both IEPs by accommodations

21

22  [9] Student does not state which IEP or IEPs her arguments address, but as she cites to portions of the ALJ's decision which

23  address both the March 22, 2013, and March 17, 2014, IEPs, and she argued during the administrative hearing that both IEPS

24  should have included goals focused on attention to task, AR at 1151 ¶ 5, the Court infers that Student objects to both the

25  March 2013 and March 2014 IEPs.

1   and the provision for a one-to-one aide.  *Id.*

2      In her reply brief, Student responds that problems in maintaining attention were addressed or

3   noted at a number of times by multiple individuals, including teachers, classroom aides, Student's

4   psychologist, speech pathologist, and behavior analyst, and were addressed in IEPs, assessments,

5   reports, evaluations, and behavior intervention plans.  Doc. 44 at 2-3.  Student notes that the ALJ made

6   factual findings that Student "has difficulties with attention," AR at 1104 ¶ 3, and that in Student's

7   March 22, 2013, IEP, her "greatest need was staying focused."  AR at 1105 ¶ 6; Doc. 44 at 2-3.  Student

8   additionally argues that District misapplies the standard for evaluating IEPs and conflates the skills

9   involved in maintaining attention and following directions.  Doc. 44 at 3.  Finally, she argues that,

10  without a specific goal designed to measure Student's ability to remain on task, there is no way to

11  measure Student's progress in that area.  *Id.* at 4.

12      As to the March 22, 2013, IEP, the ALJ concluded that

13      Student's attention to task was addressed by Goals 1 and 7, which addressed Student's

14      ability to comply with directions, and with the accommodations in the IEP, such as a

15      visual schedule, preferential seating, allowing extra classroom movement, giving on-task

16      reminders, and giving positive reinforcement.  The IEP addressed Student's attention to

17      task by providing her with a one-to-one aide.

18  AR at 1153 ¶ 11.  As to Student's March 17, 2014, IEP, the ALJ concluded that

19      Student's attention to task was addressed by Goal 4, a communication goal which

20      addressed Student's ability to comply with directions, and with the accommodations in

21      the IEP, such as a visual schedule, preferential seating, allowing extra classroom

22      movement, giving on-task reminders, and positive reinforcement.  The IEP also

23      addressed Student's attention to task by providing her with a one-to-one aide.

24  AR at 1154 ¶ 14.

25      An annual IEP includes a written statement of measurable annual goals designed to: "([1]) meet

31

the child's needs that result from the child's disability to enable the child to be involved in and make

progress in the general education curriculum; and ([2]) meet each of the child's other educational needs

that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II).  After the ALJ rendered her

decision in this matter, the Supreme Court, addressed the proper standard under which an IEP is

evaluated in *Endrew F.*  2017 WL 1066260.  The *Endrew F.* standard, which provides that an IEP must

be reasonably calculated to enable "progress appropriate in light of the child's circumstances," 2017 WL

1066260 at *10, clarifies the older standard that an IEP must be "reasonably calculated to enable the

child to receive educational benefits." *Rowley*, 458 U.S. at 206-07.  The standard of "progress

appropriate in light of the child's circumstances," while not a bright line rule, is consistent with "the

nature of the [IDEA] . . .[that] [t]he adequacy of a given IEP turns on the unique circumstances of the

child for whom it was created." 2017 WL 1066260 at *12.  The Supreme Court explained that, for a

student "who is not fully integrated in the regular classroom and not able to achieve on grade level," an

"IEP need not aim for grade-level advancement" but should be "appropriately ambitious in light of [the

student's] circumstances" such that the student has "the chance to meet challenging objectives."  2017

WL 1066260 at *11.

As stated above, the Court accords the ALJ's decision substantial deference as it was thorough

and careful, and the ALJ's weighing of the evidence was consistent with the requirements that the IEP

team consider "(i) [t]he strengths of the child; (ii) [t]he concerns of the parents for enhancing the

education of their child; (iii) the results of the initial or most recent evaluation of the child; and (iv) [t]he

academic, developmental, and functional needs of the child" in addition to special factors such as the

"use of positive behavioral interventions and supports," and "whether the child needs assistive

technology devices and services."  34 C.F.R. §§ 300.324(a)(1)-(2).

The Second Circuit has held that an IEP which does not specifically address goals and objectives

toward a need but which has goals which enable to student to make progress in the area of the need may

be substantively sufficient.  *L.O. ex rel. K.T. v. New York City Dep't of Educ.*, 822 F.3d 95, 118-19 (2d

1    Cir. 2016) (a goal which involved improving a special needs student's fine motor skills necessary for

2    performing activities of daily living and school activities enabled the student to make progress in his

3    toileting needs).  This holding is consistent with the requirement in 20 U.S.C. § 1414(d)(1)(A)(i)(II) that

4    IEP goals be designed to "meet the child's needs that result from the child's disability to enable to child

5    to be involved in and make progress in the general education curriculum; and meet each of the child's

6    other educational needs that result from the child's disability."  The IEP annual goals must meet a

7    student's needs, but the IDEA does not require that they have a one-to-one correspondence with specific

8    needs.  So long as the goals, as a whole, address the student's needs and enable progress appropriate in

9    light of the student's circumstances, the IEP is appropriate.  The ALJ, after reviewing the evidence,

10   determined that the combination of classroom accommodations, support from a one-to-one aide, and

11   goals focused on compliance with directions met Student's attention needs.

12        Student's arguments that the ALJ misapplied the standard are not convincing.  The crux of the

13   matter is whether the IEP goals complied with the statutory language and were "reasonably calculated to

14   enable [Student] to make progress appropriate in light of [her] circumstances."  *Endrew F.*, 2017 WL

15   1066260 at *10  Student has not demonstrated that the IEP ran afoul of the IDEA's language or the

16   implementing California law, and has not offered a persuasive argument that the IEP was not reasonably

17   calculated to enable appropriate progress.  Student's arguments that the goals as drafted do not permit

18   review or measuring are also not convincing, since the goals directly measure Student's ability to remain

19   on task long enough to follow two and three step directions.  The precise form that a goal takes is a

20   question of educational policy, and courts should not "substitute their own notions of sound educational

21   policy for those of the school authorities which they review."  *Rowley*, 458 U.S. at 206.  The ALJ

22   concluded that Student's difficulties with attention to task were addressed by goals in Student's IEP

23   based on a rational and thorough review of the evidence.  Student has not shown that this conclusion

24   was clear error.  Therefore, the Court finds that Student has not carried her burden of showing that the

25   ALJ's decision regarding Student's IEP goals was error.

33

1

2

3       **3.**     <u>**Least Restrictive Environment**</u>

4       The IDEA requires states receiving federal assistance for the education of disabled children to

5 establish procedures assuring that special education students are educated in the least restrictive

6 environment ("LRE") and that

7       "[t]o the maximum extent appropriate, children with disabilities . . . are educated with

8       children who are not disabled, and special classes, separate schooling, or other removal of

9       children with disabilities from the regular educational environment occurs only when the

10       nature or severity of the disability of a child is such that education in regular classes with

11       the use of supplementary aids and services cannot be achieved satisfactorily."

12 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.114-120.  Section 1412(a)(5)(A) is also referred to

13 as the IDEA's "mainstreaming" requirement.  *Sacramento City Unified Sch. Dist., Bd. of Educ. v.*

14 *Rachel H. ex rel. Holland* [*Rachel H.*], 14 F.3d 1398, 1403 (9th Cir. 1994).  This requirement "sets forth

15 Congress's preference for educating children with disabilities in regular classrooms with their peers."

16 *Id*.  While the IDEA states a strong preference for mainstreaming, it is not an absolute requirement.

17 *Poolaw v. Bishop*, 67 F.3d 830, 836 (9th Cir. 1995).  There is "a natural tension within the IDEA as state

18 educators try to establish appropriate educational programs for handicapped children to meet their

19 unique needs while attempting to comply with the IDEA's clear preference for mainstreaming."  *Id.* at

20 834.  To determine whether a placement provides mainstreaming "to the maximum extent appropriate,"

21 The Ninth Circuit employs a four factor analysis adopted in *Rachel H.*  13 F.3d at 1403.  The four

22 factors identified in *Rachel H.* are: "(1) the educational benefits of placement full-time in a regular class;

23 (2) the non-academic benefits of such placement; (3) the effect [the student has] on the teacher and

24 children in the regular class; and (4) the costs of mainstreaming [the student]."  *Id*. at 1404.

25       The regulations implementing § 1412(a)(5) further clarify what constitutes the LRE.  To conform

1   with the LRE requirement, a placement should be "as close as possible to the child's home."  34 C.F.R.

2   § 300.116(b)(3).  Additionally, "[u]nless the IEP of a child with a disability requires some other

3   arrangement, the child is educated in the school that he or she would attend if nondisabled." 34 C.F.R. §

4   300.116(c).  Consideration must be given "to any potential harmful effect on the child or on the quality

5   of services that he or she needs," and no child with a disability may be excluded from regular

6   classrooms "solely because of needed modifications in the general education curriculum." 34 C.F.R. §

7   300.116(d),(e).  The question of whether a placement constitutes a LRE is "necessarily an

8   individualized, fact specific inquiry."  *Poolaw*, 67 F.3d at 836.

9          Student argues that, while the ALJ correctly cited the *Rachel H.* factors as guiding the analysis of

10  whether the Stockdale program constituted a LRE, she misapplied them by considering aspects of the

11  placement separately and applying only some of the factors.  Doc. 40 at 20-21.  As Student explains, the

12  ALJ considered whether the Stockdale classroom conformed to Student's IEP, whether the commute to

13  and from Stockdale was reasonable, and whether a general education setting would have been

14  appropriate under the *Rachel H.* factors.  *Id.* at 21.  Instead of addressing elements of the Stockton offer

15  individually, Student argues, the ALJ should have considered the offer as a whole.  *Id*.  Student contends

16  that the Stockdale placement would deprive her of the 20 minutes per day of general education time

17  included in her March 2013 IEP, as well as 160 minutes per day spent commuting, which would

18  constitute a more restrictive placement than her home school.  *Id.* at 22.  Student argues that the ALJ

19  dismissed the potential benefits of the new behavior support plan in Student's December 18, 2014, IEP,

20  and that the dismissal was erroneous.  *Id.* at 24.  Finally, Student asserts that the ALJ improperly

21  disregarded the non-educational benefits of the general education time provided to Student at her home

22  school, that there was no evidence of cost, that there was no evidence of disruptive impact to the teacher

23  and children in Student's regular class, and that Student was improving in her home school.  *Id.* at 25.

24         District responds, arguing that the ALJ's conclusions were both legally sufficient and supported

25  by the evidence.  Doc. 43 at 13.  It asserts that, contrary to Student's assertions, her behaviors under the

1    behavior support plan were not improving.  *Id.* at 23.  Regarding the Stockdale placement, District states

2    that the placement was consistent with Dr. Gilbertson's recommendation, that the Stockdale placement

3    offered some opportunity for mainstreaming and Student was offered an appropriate amount of

4    mainstreaming given her status at the time, and that the ALJ did not err in her analysis of Student's

5    transportation time.  *Id.* at 24-25.  District also argued that the ALJ properly applied the *Rachel H.*

6    factors, noting the ALJ's findings that Student could not obtain academic benefits in a general education

7    classroom, that given Student's then-current behavior she would likely be unable to obtain non-

8    academic benefits from a general education classroom, and that her academic weakness and behaviors

9    would be detrimental to a general education classroom.  *Id.* at 25.  Additionally, District argues that

10   Student's performance in her current District program has no bearing on whether the February 3, 2015,

11   offer was appropriate.  *Id.* at 26.

12          Ms. Siciliani[10] contests Student's characterization of the first *Rachel H.* factor, asserting that

13   proper application of the factor involves a comparison of benefits rather than a determination whether

14   Student would receive any benefits at her home placement.  Doc. 42 at 5.  The ALJ compared the

15   benefits of a general education classroom with the Stockdale classroom, and, based on the evidence,

16   found that the benefits of placing Student in the Stockdale classroom outweighed the benefits Student

17   would receive in a general education classroom.  *Id.* at 4.  Ms. Siciliani also argues that the ALJ properly

18   considered and weighed the evidence in determining that, given Student's then-current behaviors, her

19   ability to benefit non-academically from a general education classroom was questionable and her

20   behaviors would likely disrupt a general education classroom.  *Id.* at 6-7.  Finally, Ms. Siciliani argues

21   that the ALJ properly determined that Student would receive the maximum appropriate amount of

22   mainstreaming in the Stockdale placement, and that the ALJ properly considered the burden on Student

23   of commuting to Stockdale.  *Id.* at 9-10.

24   _____

25   [10] Ms. Siciliani's responsive brief addresses only the question of LRE.  Doc. 42.

36

A. **The Burden of Proof**

Student urges the Court to adopt the legal standard outlined by the Third Circuit in *L.E. v. Ramsey Board of Education*, 435 F.3d 384 (3d Cir. 2006), contending that *Ramsey* stands for the proposition that the District, "as the party seeking the more restrictive placement," has the burden of proof on the matter of LRE.  Doc. 40 at 22.  The Court finds no such rule in *Ramsey*.  In *Ramsey*, the Third Circuit held that, where there is no state law or regulation to the contrary, there was no reason to depart from the rule "that the 'burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief.'"  *Ramsey*, 435 F.3d at 391-92 (quoting *Schaffer v. Weast*, 546 U.S. 49, 62 (2005)).  The Third Circuit explained that, under New Jersey law and Third Circuit precedent prior to *Schaffer*, the school district had "the burden of demonstrating compliance with the IDEA," but that post-*Schaffer* the burden of proof is on the party seeking relief.  *Ramsey*, 435 F.3d at 391.  Here, Student challenged the appropriateness of the District's proposed IEP, and so the burden of proof was properly on Student at the administrative hearing.  Student has not cited, and the Court is not aware of, any California law or regulation which would compel the Court to depart from the standard clearly stated in *Schaffer*.

B. **The ALJ's Consideration of "Sub-Issues"**

Student alleges that, because the ALJ considered whether the Stockdale placement conformed to Student's IEP, whether the commute to Stockdale was reasonable, and whether a general education classroom would be appropriate under the *Rachel H.* factors as "sub-issues," the ALJ erred.  Student offers no authority to support this position.  The *Rachel H.* factors apply solely to the mainstreaming element of a LRE.  *See Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1187 (9th Cir. 2016).  They are not applied in determining whether a particular special education placement is suitable for a student.  Moreover, it was not error for the ALJ to structure her decision so as to consider whether the Stockdale placement comported with Student's needs separately from whether the proposed commute was reasonable.  The two aspects of the Stockdale placement involve different types of analysis.  The first sub-issue involved a determination whether the Stockdale classroom was appropriate

37

1   for Student, while the second involved assessing whether the commute itself converted the Stockdale

2   placement into one which did not comport with the LRE mandate.  Under each sub-issue, Student had

3   the burden, as the party challenging the placement, of providing evidence that Stockdale was an

4   improper placement.  Reading the ALJ's decision in its entirety, it is clear that the ALJ did not

5   impermissibly divide her analysis.

6   **C.   The ALJ's Analysis of the Stockdale Classroom's Suitability**

7        Student argues that District should have attempted to implement the behavioral intervention plan

8   created at the January 22, 2015, IEP meeting before offering the Stockdale placement.  Doc. 40 at 23-27.

9   The Court's "review, however, must focus primarily on the District's proposed placement, not on the

10   alternative that the family preferred."  *Gregory K.*, 811 F.2d at 1314.  So long as the placement was

11   reasonably calculated to enable [Student] to make progress appropriate in light of [her] circumstances,"

12   the Court must uphold it as appropriate, apart from the question of whether it was the LRE.  *See Endrew*

13   *F.*, 2017 WL 1066260 at *10.  Student points to no requirement that a school district attempt to

14   implement proposed changes to a student's IEP in that student's then-current environment before

15   offering another placement, and the Court is not aware of any such authority.

16        The question before the ALJ was whether the Stockdale placement was acceptable, taking into

17   account Student's unique circumstances.  The ALJ found that it was, supporting her decision with

18   specific evidence from Student's expert, Dr. Gilbertson, as well as evidence from Dr. Hayden, Ms.

19   Faulk, Mr. Tickle, and Mr. Thompson.  AR at 1165-66 ¶ 53.  As the ALJ observed, Dr. Gilbertson's

20   recommendations included many elements present in the Stockdale placement, including a homogenous,

21   small, and structured classroom with a language-rich environment, behavioral supports, and a program

22   emphasizing the development of academic and motor skills and social interaction.  *Id.*  Dr. Hayden

23   agreed that Student would do best in a small, homogenous, structured classroom, while Ms. Faulk

24   testified that Student would do best in a classroom with a language-rich environment.  *Id.*

25        Student does not appear to dispute in her trial brief that the Stockdale placement would have been

1   appropriate.  Instead, her argument focuses on the contention that the Stockdale placement was more

2   restrictive than placement at Student's home school because Student would have fewer opportunities for

3   mainstreaming, and District should have attempted to implement Student's behavior plan before offering

4   the Stockdale placement.  Doc. 40 at 22-23.  Student does not provide any authority supporting its

5   argument that District was required to implement the behavior plan before offering the Stockdale

6   placement.  Student's arguments regarding mainstreaming are more directed towards the ALJ's analysis

7   of the *Rachel H.* factors, and are addressed below.

8       District construes Student's arguments regarding the implementation of behavior supports at her

9   home school as an argument that the Stockdale placement was "predetermined" and Student's parents

10  were thereby deprived of an opportunity for meaningful participation in the IEP meeting.  While Student

11  makes no such argument in her trial brief, she did advance the argument at the administrative hearing

12  and refers briefly to predetermination in her reply to Ms. Siciliani's opposition without offering any

13  authority or even the relevant legal standard.  Doc. 45 at 2.  The Court need not address arguments made

14  for the first time in a reply brief.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).  Even if the

15  Court was inclined to address the question of predetermination, Student has not offered any argument or

16  analysis suggesting that the ALJ erred in her determination that there was no evidence of

17  predetermination and the December 18, 2014, IEP offer was not predetermined.  *See* AR at 1164 ¶¶ 46,

18  48.

19      Finally, Student argues that, based on excerpts from March 3 and 31, 2016, IEP meeting, Student

20  would have progressed if she had remained in the special day classroom at her home school.  The

21  evidence Student offers does indicate that she has thrived, even made "tremendous" progress since her

22  return to the special day classroom.  This success is not, however, pertinent to the appeal before the

23  Court.  An IEP is reviewed as a "snapshot" and takes into account only the evidence which was before

24  the IEP team at the time.  *Adams*, 195 F.3d at 1149.  The role of the reviewing court is not to apply

25  hindsight, but to assess whether the IEP was reasonably calculated to confer a benefit given the

1  information available to the team.  *Id*.  Consequently, the Court gives little weight to Student's

2  supplemental evidence, and Student's arguments that she would have obtained benefits from remaining

3  at her home school are not convincing.

4      D.  **The Reasonableness of Student's Commute**

5         Student contends that the ALJ "conducted *no analysis* of the potential impact to Student" of the

6  proposed commute to and from the Stockdale classroom.  Doc. 40 at 26 (italics in original).  Student is

7  mistaken.  The ALJ explicitly considered whether, based on Student's individual needs, "an 80 minute

8  bus ride was unreasonable so as to deprive Student of a FAPE in the least restrictive environment."  AR

9  at 1167 ¶ 57.  She found no evidence that Student would not be able to tolerate the trip for physical,

10  mental, emotional, or behavioral reasons.  *Id*.  The ALJ considered Dr. Gilbertson's opinion that

11  Student's sensory issues would negatively impact her performance after the commute, but found that Dr.

12  Gilbertson did not provide a persuasive basis for his opinion or address whether services in the

13  Stockdale classroom could address any negative impact.  *Id*.  Moreover, Dr. Gilbertson had not provided

14  that opinion to the District at the time of the December 2014 IEP, and it was therefore not relevant to

15  whether the placement offer was appropriate.  *Id*.; *see Adams*, 195 F.3d at 1149.  The ALJ also found no

16  persuasive evidence that the commute would be unsafe, and that the District adequately considered harm

17  to Student and offered individual transportation to minimize harm.  AR at 1167 ¶ 57.  The ALJ

18  additionally found that there was no specific evidence that Student's access to home behavioral services

19  would be impacted, and noted that Student provided no authority stating that District is obliged to ensure

20  access to services which are not part of Student's IEP or that she has free time.  *Id*. at ¶ 59.

21         While the regulations implementing the IDEA state a preference for placement at the school a

22  student would otherwise attend, 34 C.F.R. § 300.116(c), distance from a student's home alone does not

23  make a placement unreasonable.  *Poolaw*, 67 F.3d at 837 (holding that a residential placement 280 miles

24  from a student's home, where no closer adequate services were available, was appropriate); *Tammy S. v.*

25  *Reedsburg Sch. Dist.*, 302 F. Supp. 2d 959, 977-80 (W.D. Wis. 2003) (a placement requiring a two hour

1    and ten minute daily commute did not deprive a student of an education in the LRE because it was

2    necessary to meet the student's educational needs).  The ALJ, in determining that the Stockdale

3    placement was reasonable, considered "any potential harmful effect on the child or on the quality of the

4    services that" Student needed.  34 C.F.R. § 300.116 (d).  She determined that, based on Student's

5    individual needs, the 80 minute proposed commute was not unreasonable.    Her analysis was thorough

6    and reasonable, and supported by evidence in the record, and Student has not met her burden of showing

7    that the ALJ's decision was error.

8        E.  **The *Rachel H. Factors***

9        Student argues that the ALJ failed to consider the *Rachel H.* factors properly.  The bulk of her

10   argument focuses on the contention that the ALJ improperly did not analyze "why [Student] could not

11   be adequately supported in her home school placement as the first step in the LRE analysis."  Doc. 40 at

12   24.  Student's argument misconstrues the application of the *Rachel H.* factors.  The four factor analysis

13   adopted in *Rachel H.* is applied to determine whether a placement provides mainstreaming "to the

14   maximum extent appropriate."  13 F.3d at 1403.  The four factors are: "(1) the educational benefits of

15   placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect

16   [the student has] on the teacher and children in the regular class; and (4) the costs of mainstreaming [the

17   student]."  *Id.* at 1404.   The *Rachel H.* factors involve a comparison of the proposed environment with a

18   general education setting and a consideration of whether a student has been inappropriately denied

19   mainstreaming.  The factors are applied to analyze whether a general education classroom or portions of

20   time spent in a general education classroom would have been appropriate for a special needs student.

21   They are not used to compare the overall suitability of two IEPs.  The Court considers the ALJ's

22   analysis and Student's objections to each of the four *Rachel H.* factors and overall conclusion in turn,

23   reviewing finding of fact for clear error.  *R.B.*, 496 F.3d at 937.

24

25

1

*i.*       *Educational benefits*

2    The ALJ concluded that Student would be unable to benefit academically in a general education

3    setting due to her then-current levels of academic achievement.  While Student's cognition may have

4    been in the normal range, Student's verbal skills lagged and were at the pre-kindergarten level.  Dr.

5    Gilbertson noted that Student had deficits in assessing information, memory, and attention.  Student was

6    lagging in math and spelling as well.  The ALJ did not find any evidence that Student would be able to

7    process academic information in a general education classroom even with support.  In addition to

8    Student's lack of academic progress, the ALJ identified Student's behavior problems as an impediment

9    to her ability to obtain educational benefits.  She noted that, even with the support of two aides, Student

10   did not interact with her second grade classroom teacher and struggled to remain on task.

11   Student argues that the ALJ ignored evidence that Student had progressed in a number of her

12   goals during her kindergarten and first grade years at her home school.  Doc. 40 at 24.  She also argues

13   that there is no evidence that Student would have obtained no benefit in her home school special day

14   classroom with a new behavioral support plan.  *Id.*  Student ignores the fact that, while she had

15   progressed in the past, Student had failed to make progress academically and her behaviors deteriorated

16   more recently.  More importantly, Student's arguments are misdirected.  As explained *supra*, the *Rachel*

17   *H.* factors involve a comparison between general education and a more restrictive classroom

18   environment.  Student points to no evidence, and the Court sees none in the record, that suggests Student

19   ever had benefitted academically from a general education environment during her kindergarten or first

20   grade years.  The record reflects that Student enjoyed participating in a general education arts and crafts

21   classroom, but no evidence links that participation to any particular educational benefit.  The ALJ's

22   conclusions on the first factor are reasonable and well supported, and Student has not shown that the

23   ALJ committed clear error.

24

25

42

1

*ii.       Nonacademic benefits*

2      The ALJ noted that, even with the assistance of two aides, Student was isolated in her second

3    grade classroom.  AR at 1168 ¶ 62.  Student's aggressive behaviors and eloping would likely obstruct

4    her from reaping the benefits of social interaction and behavior role models.  AR at 1168 ¶ 63.  While

5    Student is interested in typically developing peers, she is unable to "easily tolerate or cooperate with

6    others."  *Id*.  Accordingly, the ALJ concluded that Student's behavioral difficulties were an impediment

7    to obtaining any nonacademic benefits in a general education classroom.  *Id*.

8      Student argues that she benefitted non-academically from her time in general education

9    classrooms, that her previous IEP had included time for mainstreaming, and that the Stockdale

10    placement did not contain provisions for time in general education classrooms.  Doc. 40 at 25.  Student

11    is correct that evidence in the record indicates that she was able to take part in some nonacademic

12    general education classroom activities.  She does not, however, address the ALJ's concerns about

13    Student's isolation in a general classroom environment, or the evidence regarding Student's aggressive

14    behaviors and eloping.  This is a closer question than the remaining factors, given Student's enjoyment

15    of some nonacademic general education activities and evidence in the record of her interest in typically

16    developing peers.  However, the ALJ's concerns regarding Student's isolation and behavior, her need

17    for multiple aides, and her inability to cooperate and tolerate others are based on evidence and

18    reasonable.  Therefore, Student has not met her burden on the second factor.

19

*iii.      Effect on General Education Teacher and Classmates*

20      The ALJ also concluded that Student's behaviors would have a disruptive impact on a general

21    education classroom.  A teacher would need to give Student extra attention, which would negatively

22    impact other children in the class, and Student's aggression, elopement, screaming, and whining would

23    disrupt a general education classroom.

24      Student argues there is no evidence that her behaviors had a negative impact on "the special day

25    class teacher and students" while she was enrolled in her home school.  Doc. 40 at 25.  Again, the

1   *Rachel H.* factors are not intended to apply to a comparison between two special education classrooms,

2   but rather when considering whether mainstreaming a student in general education activities is

3   appropriate.  The ALJ's analysis of the potential impact of Student's behaviors on a general education

4   classroom are reasonable and supported by evidence, particularly Student's need for two aides and her

5   numerous episodes of aggressive and eloping behavior.  Student's arguments on the third factor are not

6   convincing, and she has not shown that the ALJ erred in her analysis of this factor.

7           *iv.    Cost*

8           The ALJ did not consider any evidence of cost.  AR at 1169 ¶ 65.  Neither party introduced any

9   evidence of cost, and Student asserts that the "factor is not operative," Doc. 40 at 26, so the Court

10   concludes that the factor does not weigh in favor of the appropriateness of the Stockdale placement.  *See*

11   *Ms. S.*, 337 F.3d at 1138 (where a school district did not consider cost as a factor, it does not prevent

12   placement in a mainstream environment), *superseded by statute on other grounds by* Individuals with

13   Disabilities in Education Act Amendment of 1997, Pub. L. No. 105-17, 111 Stat. 37 (1997).

14           *v.    Conclusion*

15           Having addressed all four of the *Rachel H.* factors, the ALJ concluded that the Stockdale

16   placement satisfied the *Rachel H.* factors, and that the evidence "demonstrated that Student could only

17   be in a general education environment if she were off by herself, with a one-to-one behavioral aide

18   helping her to manage her behaviors with the assistance of the behavior support plan, and providing

19   discrete trial training.  This would turn the general education environment into a more restrictive

20   environment for Student."  AR at 1169 ¶ 65.  In light of the ALJ's rational and well-supported

21   conclusions that the three *Rachel H.* factors for which there was evidence did not weigh in favor of

22   Student's presence in a general education classroom, her conclusion that the Stockdale placement was

23   the LRE was reasonable.

24           Student also argues that District failed to consider the *Rachel H.* factors before offering the

25   Stockdale placement.  Doc. 45 at 1-2.  The *Rachel H.* factors are a judicially created test applied by

reviewing courts. While it would doubtless be to a school district's benefit to consider the *Rachel H.*
factors when developing an IEP, Student points to no authority which supports her contention that a
district *must* explicitly consider the factors before offering a placement not in a general education
classroom. The Court is not aware of any such authority, and Student moreover advances this argument
for the first time in her reply brief. The Court therefore finds this line of argument to be without merit.

The ALJ's analysis of the *Rachel H.* factors was thorough, rational, and supported by the
evidence. Her conclusion that a general education classroom was not appropriate for Student was
reasonable. Student has not offered sufficiently convincing arguments or evidence to merit a departure
from the ALJ's decision. Additionally, the ALJ applied the proper standard and reasonably interpreted
evidence in the administrative record in finding that the Stockdale placement was consistent with the
least restrictive environment requirement, and that Student's prospective commute was not
unreasonable. Accordingly, the ALJ's decision on the issue of LRE was not error.

### 4.    Compensatory Education Related to Student's March 2014 IEP

Student contends that the ALJ abused her discretion by not ordering compensatory education to
remedy the procedural violation impeding Student's right to a FAPE which occurred when District did
not provide a FAA at the time of Student's March 17, 2014, IEP. Doc. 40 at 27-28. She argues that the
ALJ noted in her decision that an award of compensatory would be appropriate for the FAPE
deprivation but did not make an award of compensatory education, asserting incorrectly that Student did
not request any particular compensatory remedy. *Id.* Student asserts that there was no evidence that she
would not benefit from compensatory education, and that she did request compensatory education in the
form of intensive instruction and a full-time one-to-one ABA trained aide. *Id.* at 29.

District argues that Student misstates the ALJ's findings, and that the ALJ actually found that
Student did not request an award of any particular compensatory education on the issue of denial of
FAPE at Student's March 2014 IEP. Doc. 43 at 27-28. More generally, District states, Student did not
offer any credible evidence in support of her requested compensatory education award of tutoring and a

1   full-time ABA trained aide.  *Id.* at 28.  Finally, District argues that the ALJ's decision was an

2   appropriately crafted equitable remedy given the evidence Student offered.  *Id.*

3        "Compensatory education is an equitable remedy that seeks to make up for educational services

4   the child should have received in the first place and aims to place disabled children in the same position

5   they would have occupied but for the school district's violation of IDEA."  *R.P. v. Prescott Unified Sch.*

6   *Dist.* [*R.P.*], 631 F.3d 1117, 1125 (9th Cir. 2011) (internal citations, quotation marks, and brackets

7   omitted); *see also* 20 U.S.C. § 1415(i)(2)(C)(iii) (authorizing a reviewing court to "grant such relief as

8   the court determines is appropriate").

9        The ALJ noted that compensatory education would be an appropriate remedy to make Student

10  whole for District's failure to offer a FAA in March 2014.  AR at 1174 ¶ 1.  She inferred that, had

11  District offered the FAA, it would likely have resulted in additional behavior supports for Student.  *Id.*

12  Consequently, the ALJ ordered that Student be provided with a full-time one-to-one behaviorally trained

13  aide to assist Student for 60 days, as well as a transition plan.  AR at 1176 ¶ 4.  The ALJ explicitly stated

14  that the services of the one-to-one behaviorally trained aide and the transition plan were intended as a

15  remedy for District's failure to provide sufficient behavior support.  AR at 1175 ¶ 3.  Compensatory

16  education, as well as other equitable remedies, may be awarded to craft the appropriate relief.  *See* 20

17  U.S.C. § 1415(i)(2)(C).  "Appropriate relief is relief designed to ensure that the student is appropriately

18  educated within the meaning of the IDEA."  *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d

19  1489, 1497 (9th Cir. 1994).  A generalized award of "day-for-day" compensation is not appropriate in

20  all cases.  *Id.*  Compensatory education does not simply mean additional classroom hours or tutoring

21  services.  As the Ninth Circuit has noted, "[c]ourts have been creative in fashioning the amount and type

22  of compensatory education services to award."  *R.P.*, 631 F.3d at 1126 (collecting cases awarding

23  various remedies).  The purpose of compensatory education is to "bring [students] to the point [they]

24  would have been, had [they] received a FAPE all along."  *Id.*

25       The ALJ awarded the remedy of a one-to-one behaviorally trained aide and transition plan to

make Student whole for District's failure to provide a FAA and the additional behavior services which would have likely followed.  Not only does this remedy constitute "compensatory education," it is also crafted to bring Student to where she would have been, had District offered an FAA in March 2014. The remedy, as much as possible, provides Student with the behavior support she was denied.  Since the remedy awarded by the ALJ was appropriate for the harm Student suffered, the Court finds that the ALJ did not err in failing to grant Student the specific compensatory education she requested.

## VII. CONCLUSION AND ORDER

For the foregoing reasons, the administrative decision is affirmed in full.

IT IS SO ORDERED.

Dated:   __April 5, 2017__                    _____ /s/ Lawrence J. O'Neill _____
                                                UNITED STATES CHIEF DISTRICT JUDGE

47